***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The Defendants have shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** EVIDENTIARY MATTERS
Plaintiff filed a Motion to Consider Proffered Evidence on June 23, 2010. Defendants responded to the Motion on July 2, 2010, and objected to Plaintiff's Motion. After consideration of the written and oral arguments of the parties, Plaintiff's Motion is hereby DENIED.
 *********** *Page 2 
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. Plaintiff worked at the Catawba plant from May 24, 1990, until November 11, 1990, as a material handler. He worked at the Catawba Facility again from December 16, 1994, until July 23, 2005, the last day he physically worked. However, Plaintiff remained an employee until July 24, 2006. From December 16, 1994, until July 24, 2006, he worked as a jacket operator. The facility was operated by Defendant-Employer through the Plaintiff's last day of employment.
3. Defendant-Employer was insured for workers' compensation by Liberty Mutual Insurance Company with its coverage extending from July 25, 1997, through September 25, 2005. Thereafter CNA became the carrier for Defendant-Employer.
4. There was an employee-employer relationship between Plaintiff and Defendant-Employer at all relevant times herein.
5. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. stipulation #1 (a, b and c), medicals, forms, discovery and etc.;
 b. stipulation #2, pictures; *Page 3 
 c. stipulation #3, Mr. Narvaez's drawing;
 d. stipulation #4;
 e. Defendants' #1, drawing by Mr. Waddell of vat w/wire and etc.;
 f. Defendants' #3, drawing of plant w/ distances.
6. The issues presented to the Deputy Commissioner for determination were as follows:
 a. Whether Plaintiff developed an occupational disease as a result of his employment with Defendant-Employer?
 b. If so, to what, if any, workers' compensation benefits is Plaintiff entitled to recover under the North Carolina Workers' Compensation Act?
 c. When was Plaintiff last injuriously exposed?
 d. What was Plaintiff's average weekly wage?
 e. Whether Defendants are entitled to any credits?
7. At the hearing before the Full Commission the parties stipulated to a compensation rate for Plaintiff in the amount of $551.18 per week.
 ***********
The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Gerald Williams was sixty-two (62) years of age at the time of the hearing before the Deputy Commissioner. Plaintiff is a high school graduate, and he attended barber school. He worked four years as a barber. He has also worked as an upholsterer. He has also performed work as a machine operator. Plaintiff started working for Defendant-Employer in 1990. He worked as a Material Handler. He was laid off after about seven months of work and then he returned to Defendant-Employer in 1994 as a Jacket Operator in the Trunk Department. Plaintiff was employed as a Jacket Operator from 1994 until July of 2006.
2. As a jacket operator, Plaintiff oversaw a line of cable in the trunk department. He was responsible for setting the machines on his line and keeping the cable within specifications.
3. When Plaintiff returned to work in 1994 at the Catawba Facility, he worked on Line 600 until the end of 1999. In 2000, he started on Line 604, and he worked on that line until 2005. Both lines 600 and 604 are in the Trunk Department. The trunk cable is the large hard bound cable that is used for underground cable, that hangs on power lines, and that is used for TV.
4. Line 127, which is adjacent to Line 604 where Mr. Williams worked, is a line in which the primary cable was manufactured. A polyethylene foam core is made that goes around the center conductor. On line 127, core adhesive, a water based solution with an adhesive dissolved in it, is applied to the foam dielectric to help the outer aluminum bond to it. The adhesive also helps to block water. Excess core adhesive is wiped off by sponges and rubber wipes. The cable then goes through a gas flame tunnel that evaporates water, leaving a hard adhesive on the outer part of the foam dielectric. There are approximately ten to fifteen feet between Line 604 and the area where the core adhesive is applied. The cable is then run onto big reels. *Page 5 
5. The primary cable is then run through hollow aluminum that is stretched out through a tunnel about twenty-five hundred feet long. A birdie (a piece of steel) is shot through the aluminum and the primary cable is pulled through the aluminum tube. After the core is pulled through the aluminum tube, in the swaging department adjacent to the trunk lines, it is traversed onto big reels. The aluminum clad cable is in 2,500 foot lengths. The large reels are then placed in the whip area.
6. A band saw is located about 100 yards from Line 604. The helpers cut the ends of the aluminum jacket so that each successive reel can be spliced to the reel run before it. The Jacket Line Helpers bring the cable from the whip area over to the line. The Jacket Line Operators (the position held by Plaintiff) are responsible for crimping or connecting each successive line. The operator on the jacket lines loads the reels onto the payoff on the line. They attach the sleeve to the tail end of the reel that preceded it, and crimp the cables together. The jacket operators run 40 to 65 reels per day. Plaintiff would roll the reel to the payoff, lock it in, and lift it up. As the aluminum cable comes off the reels, it first goes through a series of rollers to keep it straight. The cable then runs through a combination of sponges and wipes to remove the excess swaging oil (mineral oil), the aluminum particles, and any foreign matter. Plaintiff testified that he would have to change the wipes every three or four reels. After the cable ran through the sponges and wipes, it ran through the flooding area where Vistanex was applied; an adhesive heated to around two hundred degrees to drip on the cable.
7. After the flooding area, the cable would then go to the extruder (or the head). Plaintiff testified that the extruder heats the polyethylene to 440 degrees and applies the black jacket onto the cable. The polyethylene compound comes down into the extruder from hoppers in the penthouse above. After the black polyethylene jacket was applied to the cable, the cable went *Page 6 
through a system of two to three water troughs. Plaintiff testified that he had to keep the sponges in the water to keep the water level above the cable. The sponges keep the cable up where it needs to be.
8. Plaintiff also had a desk area where he would record specifications. After every three to four reels, he would have to check the jacket and record the specifications.
9. Plaintiff was out of work three different times for medical leave. First, he was out from approximately January 7, 2003, until March 28, 2003, or eleven weeks. He was out during this period of time for back surgery at Catawba Valley Medical Center. During Plaintiff's second medical leave, he was out was from March 17, 2005, until May 9, 2005 and had double hernia surgery at Frye Medical Center. The third medical leave began on July 23, 2005. Plaintiff underwent rotator cuff surgeries at Wake Forest University Baptist Medical Center on July 23, 2005, and November 23, 2005. On January 24, 2006, Plaintiff underwent a heart catheterization and surgery.
10. Since July of 2005, Plaintiff has received short term disability in the amount of $10.490.51. Defendant-Employer paid the full premium for the short term disability.
11. Plaintiff has been receiving Social Security Disability benefits since 2005.
12. Plaintiff ended his employment with Defendant-Employer because he had two rotator cuff surgeries, and was out of work for approximately seven months. Plaintiff then started having breathing problems and underwent triple bypass surgery.
13. While working for Defendant-Employer, Plaintiff experienced several health problems, including headaches, breathing problems, skin rashes, and numbness and tingling in his feet and legs. Plaintiff was treated multiple times as a result of the rashes and, at times, this treatment was provided in an emergency room. *Page 7 
14. Plaintiff treated with Dr. Miller, a neurosurgeon, who performed an MRI of Plaintiff's neck and lower back and found pinched nerves and spurs. He was then referred to another physician for steroid shots. After the second steroid shot, Plaintiff reported persistent numbness in his feet, impaired balance, ear pain, and problems with vertigo.
15. Plaintiff was referred to Dr. Yapundich, an expert in neurology and neurophysiology, who diagnosed Plaintiff with peripheral neuropathy in January 2002 after reviewing nerve conduction studies. Thereafter, Plaintiff treated with Dr. Yapundich on several occasions. In August of 2003, Plaintiff complained of a rash and headaches that he felt were related to chemical exposures at work. Dr. Yapundich reiterated his diagnosis of neuropathy and ordered a glucose tolerance test, the result of which was abnormal.
16. In February 2004, Dr. Yapundich ordered that Plaintiff's urine be tested for heavy metals. The test results showed elevated levels of organic arsenic, but did not reveal any inorganic arsenic, which is the toxic form of arsenic.
17. Plaintiff was referred (by Dr. Yapundich) to Dr. Peter D. Donofrio at Wake Forest University Baptist Hospital in 2004 for a second opinion as to what might be causing Plaintiff's ongoing issues with his legs. Dr. Donofrio was the acting Chairman of Neurology for approximately one and one half years at Baptist Hospital before moving to Vanderbilt University in August of 2006 to become Chief of the Neuromuscular Section in the Department of Neurology. He is the Director of the EMG Lab at Vanderbilt. His research has focused on inflammatory neuropathy as well as toxic neuropathies. He is board certified in internal medicine, neurology, and electromyography.
18. Plaintiff's abnormal glucose tolerance test convinced Dr. Donofrio that Plaintiff was probably diabetic. On October 11, 2004, Dr. Donofrio performed a nerve conduction study *Page 8 
and EMG. The study results were most consistent with Chronic Inflammatory Demyelinating Polyneuropathy (CIDP) and diabetes. The results were atypical for chronic arsenic poisoning. Dr. Donofrio explained that chronic arsenic poisoning normally gives features of an axon neuropathy rather than an inflammatory demyelinating neuropathy. Dr. Donofrio also ordered a urine test as well as blood tests for arsenic, both of which were negative. He testified that the nerve conduction studies show that the motor nerves were more affected than the sensory nerves, which was very much consistent with CIDP. Because of his normal urine and blood arsenic levels, he did not think arsenic was playing an active role, and he stated that was still his opinion five years later. He explained that the reason is because when you look at the records from 2004 all the way through his leaving Baptist Hospital, the clinical picture looks like CIDP and diabetic neuropathy. Moreover, the nerve conduction studies and EMG did not give the picture of chronic arsenic poisoning or a chronic arsenic neuropathy.
19. Dr. Donofrio testified that Plaintiff's condition was worse at the November 8, 2005, examination. Given that Plaintiff last worked for the employer in July of 2005, Dr. Donofrio was of the opinion that it was highly unlikely that the worsening condition noted on November 8, 2005, would be consistent with chronic arsenic exposure or other toxic exposure at the workplace.
20. Dr. Richard Jackson, an Assistant Professor of Neurology at Wake Forest University took over Plaintiff's care on November 28, 2006, when Dr. Donofrio left Wake Forest University. Dr. Jackson was also of the opinion that Plaintiff was suffering from CIDP. Dr. Donofrio testified that Dr. Jackson's findings were consistent with CIDP and diabetic neuropathy. Dr. Jackson's evaluation showed considerable worsening of Plaintiff's condition. Dr. Donofrio *Page 9 
testified that this worsening would not be consistent with his condition being caused by arsenic or other toxic exposure.
21. There is no evidence in the record of a urine test showing high levels of inorganic arsenic from an occupational exposure. There were actually three negative urine tests for inorganic arsenic, the February 13, 2004 LabCorp report, Dr. Donofrio's October 11, 2004 urine screen, and a January 21, 2005 urine screen performed at Catawba Medical Center. Dr. Robert Yapundich stated that the February 13, 2004 Lab Corp report indicated "none detected under inorganic". He stated that the lab test did not reveal any inorganic arsenic. The arsenic shown by the test was organic arsenic, which is thought to be non-toxic. Thus, there was no inorganic arsenic detected. None of the medical experts testified that the February 13, 2004 Lab Corp report indicated an occupational exposure to inorganic arsenic.
22. Dr. Osbahr, who is board certified in occupational medicine, performed a document review in this matter, including a review of Plaintiff's medical records from 2001 to 2008. He stated that the February 2004 test showed only organic arsenic, a non-toxic form of arsenic.
23. Dr. Donofrio explained that the only time that an arsenic neuropathy causes a demyelinating neuropathy is during the first few weeks after an acute exposure to arsenic, and that this type of exposure would cause hospitalization. Thus, he said that it is not difficult to identify a demyelinating neuropathy caused by arsenic. He stated that when someone is exposed to a very high level of arsenic over a short period of time (which is the type of arsenic exposure that can cause demyelination), they develop a neuropathy, congestive heart failure, liver damage, confusion, and they are often in an intensive care unit on a respirator. Therefore, the *Page 10 
demyelinating component that you see on nerve conduction studies for arsenic exposures corresponds to acute severe hospitalizations.
24. In regard to the issue of whether Plaintiff suffered a pre-existing arsenic neuropathy, the 2002 and 2003 nerve conduction studies performed by Dr. Thoms Ray at Catawba Valley Medical Center actually showed demyelinating features that were consistent with CIDP and diabetic neuropathy. Dr. Donofrio stated that the January 2002 Nerve Conduction Study from Catawba Valley Medical Center could be due to either diabetic neuropathy or CIDP. It is not the study he would expect to see in chronic exposure to arsenic. In regard to the June 9, 2003 nerve conduction study performed at Catawba Memorial Hospital, Dr. Donofrio said that there were some clear demyelinating features. He testified that the study would be consistent with the diagnosis of CIDP and diabetic neuropathy. He stated the study results would be very atypical for a chronic low exposure to arsenic over weeks and months. Dr. Donofrio felt the results could be consistent with acute arsenic poisoning, which would involve a very large dose taken primarily by mouth or ingested, which would lead to a catastrophic illness with organ involvement. However, there is no evidence in this case of a corresponding catastrophic illness or hospitalization.
25. During cross-examination by Plaintiff's counsel, Dr. Donofrio was asked about various articles that showed that high levels of arsenic in drinking water can contribute to or cause diabetes. However, Dr. Donofrio said that if you want to extrapolate that to the exposure of Plaintiff, the only way you could use these articles would be if Plaintiff was drinking water that had higher arsenic levels as a result of his work. He stated that he has no idea of whether the diabetes suffered by Plaintiff was caused or contributed to by arsenic exposure. No physician has opined that arsenic exposure caused or contributed to Plaintiff's diabetes. *Page 11 
26. Dr. Donofrio explained in detail why the electrophysiological picture on the October 11, 2004 nerve conduction study did not look like a prolonged chronic exposure to arsenic. He explained that with chronic arsenic exposure, there is axon loss neuropathy, the amplitudes would be low, the conduction velocities would be either normal or close to normal, and the distal latencies and F-waves would be either normal or only slightly affected. However, the October 11, 2004 studies showed pronounced slowing of conduction velocities rather than normal or close to normal velocities. The distal latencies were prolonged rather than normal or only slightly affected, and the F-waves were prolonged rather than normal or slightly affected.
27. Plaintiff presented to Dr. Elizabeth Sheretz in regard to a rash he had developed on September 20, 2003. He was referred to Dr. Sheretz by Dr. Joseph L. Jorizzo, Professor and Former Chair of Wake Forest University Baptist Medical Center Dermatology. Dr. Sheretz' medical specialty for over twenty years has been in the area of contact dermatitis and occupational skin diseases. She is a former Assistant Professor at the University of Florida Medical School, and a former Professor at Wake Forest University Medical School. She is board certified in dermatology. Dr. Sheretz examined Plaintiff on September 20, 2003. Plaintiff provided a history of his work, brought Material Safety Data Sheets (MSDS), including ammonium, some plastic resins, methyl ethyl ketone (MEK), and some inks to Dr. Shertetz. Plaintiff also brought pictures of himself showing what he claimed was the occupational rash.
28. Dr. Sheretz opined that the pictures showed stasis dermatitis. She explained that stasis dermatitis is inflammation of the skin on the lower legs related to pooling of fluid in the skin from gravity. It is related to varicose veins, being on one's feet a lot, and being overweight. The stasis dermatitis appeared as erythema or redness on the top of his foot and the front of his lower legs. Her physical findings on the day of the exam, in addition to reviewing the pictures, also *Page 12 
included stasis dermatitis. She thought the combination of being overweight and having moderate to severe varicose veins were probably the most important factors in what she saw on his skin.
29. Dr. Sheretz also indicated that Plaintiff's stucco keratoses were benign inherited growths. Dr. Sheretz explained that arsenic can cause keratoses, but not symmetrical stucco keratoses on the lower extremities as Plaintiff exhibited. She explained that arsenical keratoses are found on the palms of the hands and the soles of the feet in a very distinct pattern. His were on the top of his feet, and he also had hemosiderin, which is related to iron deposits on the skin.
30. Dr. Sheretz testified that the rash that she saw was not consistent with arsenic exposure, and that what she saw was stasis dermatitis. She saw a reddish-orange discoloration of the interior and anterior portion of the lower feet that was fairly symmetrical. That is not the type of pigmentation that is seen with arsenic. Arsenic induced rash tends to be a gray, a grayish-tan color rain drop type pigmentation, rather than confluent reddish-orange. Redness on the top of the feet and the lower legs above the ankles is most consistent with a localized swelling process of the lower legs. Arsenical keratoses tend to be on the palms, sometimes in the creases, but on the palmar or plantar surface, not on the top of the ankle or foot. Dr. Sheretz made no note of any findings on his hands. Plaintiff's keratoses were on the top of his feet. She did not find any rain drop pigmentation, which is the type you would expect to find with arsenic type exposure.
31. Plaintiff's original treating neurologist, Dr. Yapundich, stated that assuming the numbers generated off the pictures of the test performed at Wake Forest University Baptist Hospital are correct, he would agree with the diagnosis of CIDP.
32. Dr. Yapundich testified that if someone is diagnosed with CIDP, it is fair to say that he would have to rule out other potential causes of neuropathy, such as toxic exposures. He *Page 13 
stated that the main test to determine whether someone suffers from CIDP is the EMG and nerve conduction study.
33. Plaintiff was examined by Dr. Dennis Hill, a board certified neurologist. At the time of the examination, Dr. Hill obtained a personal history, including an exposure history, from Plaintiff. In contradiction to Plaintiff's treating neurologists Dr. Donofrio and Dr. Jackson, Dr. Hill was of the opinion that Plaintiff suffered arsenic or toxin related neuropathy.
34. Dr. Hill indicated that Plaintiff's rashes were a key basis for his opinions. He stated that the skin rashes do not fit with CIDP. During his second deposition, Dr. Hill admitted that part of his opinion was based on the assumption that any skin rashes that Plaintiff suffered were related to a toxic exposure. Dr. Hill stated that the most important part of Plaintiff's history was that related to April of 2003 when Plaintiff reported he was exposed to fumes that caused him to cough and become short of breath, and that within days he developed a blistering rash over his arms and feet, and two to three weeks later he developed numbness and burning in his feet with the slight involvement of his hand. However, based upon Dr. Sheretz' testimony, the skin rashes were not related to arsenic or toxic exposure. Plaintiff's stasis dermatitis was related to his varicose veins and his being overweight. Plaintiff's stucco keratoses were benign inherited growths on the top of his feet. They were not at the usual location of arsenic keratoses. Dr. Sheretz did not find the type of pigmentation normally associated with arsenic exposure.
35. Dr. Hill also pointed to the nerve conduction velocities on the October 11, 2004 test performed by Dr. Donofrio. Dr. Hill testified that because the nerve conduction velocities were moderate, they would be more consistent with arsenic or toxin related neuropathy.
36. Dr. Donofrio indicated that there are parameters other than conduction velocities that are looked at with the nerve conduction studies that carry equal importance to the conduction *Page 14 
velocities, such as distal latencies and F-wave latencies. For example, he explained that with chronic arsenic exposure, there is axon loss, the amplitudes are low, the conduction velocities would be either normal or close to normal, and the distal latencies and F-waves would be either normal or only slightly affected. However, the October 11, 2004 study showed pronounced slowing of conduction velocities, the distal latencies were prolonged, and the F-waves were prolonged. Thus, Dr. Hill failed to look at all of the parameters of the nerve conduction study. The velocities and additional findings were inconsistent with arsenic or toxin related neuropathy.
37. However, Dr. Hill did agree that based on the nerve conduction velocities, CIDP could not be ruled out as a diagnosis.
38. Dr. Hill stated during cross-examination that if other workers were exposed to the same compounds, he would expect others to have similar symptoms. Scott Waddell, Defendant-Employer's current EHS and facilities manager at the Catawba plant since 2002, testified there has been only one other report of neuropathy despite the number of employees at the plant remaining constant at around 1,000. The other report of neuropathy was in the swaging department, adjacent to the trunk department. Line 604 is approximately 520 feet from where the closest vat was located; there have been no reports of neuropathy in the Bobbin Winding Department, where the vats were contained.
39. Also during cross-examination, Dr. Hill indicated that the medical records he reviewed included medical records only from Dr. Donofrio and Dr. Caress, as well as the nerve conduction studies from January 17, 2002. Thus, Dr. Hill had a very limited medical history. Dr. Hill did not have Dr. Sheretz' medical note which indicated that Plaintiff's rash was not related to arsenic exposure. Dr. Hill did not have the medical records related to Plaintiff's other medical conditions including Barrett's Esophagus, headaches from lumbar puncture, GERD, diverticulitis, *Page 15 
etc. that explained various symptoms he was experiencing. Dr. Hill actually had a very limited history rather than a full history.
40. In regard to his written report indicating in the impression section, "arsenic as documented by laboratory data", Dr. Hill admitted that it was based on the February 13, 2004 urine screen report from Dr.Yapundich. As noted by Dr. Yapundich and other physicians in their depositions, this report only indicated organic arsenic; it did not actually indicate an occupational exposure to inorganic arsenic.
41. Plaintiff took a second deposition of Dr. Hill. Although Dr. Hill in his first deposition said nothing about the possibility of a diabetic neuropathy, in his second deposition, he said that he believes that Plaintiff has a mild diabetic neuropathy superimposed with an arsenic or other type of toxin neuropathy. Dr. Donofrio and Dr. Jackson believe that Plaintiff had a diabetic neuropathy and CIDP.
42. Dr. Hill said in his second deposition that diabetic neuropathy is normally a small fiber sensory neuropathy that involves mostly pain and temperature. Normally, there is not involvement of the large fibers. He said that large fibers are the part of the sensory position that carry position changes. Dr. Hill said that Plaintiff was unable to appreciate movement of the great toes. He said that you would not expect to see that degree of marked impairment with someone with a diabetic related neuropathy. However, Dr. Donofrio said that a mild diabetic neuropathy can also affect the medium and large fibers as well. He said that CIDP can affect small fibers and large fibers, but it tends to affect the large fibers more. Dr. Donofrio also said that if someone is unable to appreciate movement of the big toe, it can be a sign of CIDP. Thus, Plaintiff's inability to appreciate movement of the big toe was consistent with the diagnosis of CIDP by Drs. Donofrio and Jackson. *Page 16 
43. Furthermore, it was Dr. Donofrio's opinion that the 2002 and 2003 nerve conduction studies were also consistent with CIDP and diabetic neuropathy, and neither the 2002 or 2003 studies are what he would expect to see in chronic exposure to arsenic.
44. Dr. Donofrio is the Chief of the Neuromuscular Section in the Department of Neurology at Vanderbilt, he is board certified in electromyography and is in charge of the nerve conduction and EMG lab. Dr Donofrio's major research interest is in the field of peripheral neuropathy and motor neuron disorders. On the other hand, Dr. Hill testified that one-half of his practice is devoted to his sleep clinic and one-half to neurology, and only 5 to 10% of his practice involves peripheral neuropathies. In addition, Dr. Jackson, one of the other treating neurologists, an Assistant Professor of Neurology, agreed with Dr. Donofrio's opinions. Dr. Yapundich, the original treating neurologist, testified that he would agree with the diagnosis of CIDP if the numbers on the Wake Forest University nerve conduction/EMG study were correct. Dr. Yapundich completed a fellowship in an EMG Neuromuscular Fellowship at the University of Alabama in Birmingham. Thus, none of the treating neurologists were of the opinion that Plaintiff suffered an arsenic or toxin related neuropathy. The Full Commission finds that greater weight is to be given to the opinions expressed by Dr. Donofrio than those of Dr. Hill.
45. Dr. Schwartz is the Director of Pulmonary Critical Care Medicine and Genetics at National Jewish Health. He is board certified in internal medicine, pulmonary medicine, and occupational medicine. Dr. Schwartz performed a document review and said that the two reasons that he disagrees with Dr. Donofrio are, first of all, that Plaintiff did not have a systemic inflammatory disorder, either caused by infection or idiopathic. Second, Plaintiff was exposed to arsenic, so he had a much more tangible explanation for his polyneuropathy than CIDP. By "systemic inflammatory disorder", he explained that he did not have an immunologic disorder like *Page 17 
scleroderma or lupus or rheumatoid arthritis, and did not have an infectious disease like an occult viral infection or a sustained bacterial infection. However, as Dr. Yapundich, the original treating neurologist, explained, the exact cause of CIDP is not known. It could be viral. Many times a causative agent is not identified. Dr. Yapundich stated that a person can have a disease and the body can mount a response against the disease, and that attack on the disease spills over into the nerves. A person can have a situation where the disease that triggered the initial attack on the nerves goes away, but unfortunately the body does not forget what those nerves looked like, and still thinks those nerves are foreign invaders and will continue to attack those nerves even though the initial disease process is gone. He agreed that it is believed that CIDP can start from a simple infection. It could be viral. He stated that many times, they do not come up with a positive agent. With CIDP, generally it is difficult to pinpoint a cause or triggering event. He stated that sometimes you may get lucky and find something, but in his experience, it is usually not the case. Therefore, not identifying a known cause for CIDP would not be a valid basis for determining that Plaintiff's neuropathy is not CIDP. It is actually more typical not to identify the cause.
46. In addition, Dr. Schwartz admitted that he has never made the diagnosis of CIDP. He has never treated anyone with CIDP.
47. Dr. Schwartz was also of the opinion that Plaintiff was exposed to solvents; however, he could not identify a particular solvent. Moreover, he said that he was not familiar with any particular study addressing the relationship between polyneuropathy and solvents. Based on the testimony of Randy Minton, who is currently a materials development engineer at Commscope responsible for raw materials, evaluation, testing, and qualification of any substance that goes into cable as a raw material, and Shayne Gad, Ph.D., a toxicologist who was initially involved in the investigation of the dermatitis problem at the Catawba plant, the Industrial *Page 18 
Commission finds that there was not a solvent present in the plant that could cause a neuropathy. Dr. Gad did admit that some solvents can cause a neuropathy. However, in regard to the MSDS sheets of the Catawba Facility, he researched the literature, and there were no solvents that were associated or known to be associated with a peripheral neuropathy or a central neuropathy.
48. Moreover, Dr. Schwartz stated that it is not a standard part of his practice to review electrodiagnostic studies. It is not a normal part of his medical practice to differentiate various types of polyneuropathies. He admitted that there are many causes of dermatitis. He admitted that mineral oil can cause dermatitis. Dr. Schwartz also testified that the skin rashes that normally appear from arsenic exposure occur on the soles of the feet or the palms of the hands as keratoses, where you have increased thickening of the skin. He agreed with Dr. Sheretz that arsenic keratoses normally appear on the soles of the feet and the palms of the hand.
49. Dr. Schwartz also said that he reviews 100 to 150 cases for Wallace and Graham per year, and he has been doing that for about 6 to 7 years. The Industrial Commission finds that less weight should be assigned to Dr. Schwartz' opinions given the fact that only a small percentage of his practice is related to neuropathy, and given the fact that he has not diagnosed any cases of CIDP.
50. Dr. Osbahr stated that it appears that Plaintiff's neuropathy is not getting better. It is showing signs of progression. Normally with a neuropathy related to arsenic or toxic exposure, you would expect the neuropathy to plateau or improve after removal from the toxin.
51. Dr. Osbahr indicated that Plaintiff's skin eruptions resolved with the help of steroid treatment. He said that a steroid is usually going to help an immunological situation or a contact dermatitis, but not a typical metal type of systemic toxicity which would lead to skin changes. *Page 19 
52. In regard to Mr. Waddell's testimony that there was only one other reported case of a neuropathy at the Catawba facility during his tenure at the facility since December 2002, Dr. Osbahr said that he would have expected more cases if there was an ongoing exposure.
53. Dr. Osbahr opined that Plaintiff's condition seems to fit CIDP because he has an ongoing condition that does not see any change whether you have removal, or reduction, of toxic exposure.
54. Plaintiff's attorney asked Dr. Osbahr if an arsenic related neuropathy can aggravate the symptoms one would experience with CIDP, and he responded that he believes that there would have been more of a change in symptoms, an "up-tick" with the exposure, and then a "down tick" when Plaintiff was removed from the exposure.
55. Plaintiff has failed to establish that he sustained a compensable occupational disease. Plaintiff has failed to establish that his neuropathy was causally related to arsenic exposure or other toxic exposure.
56. Mr. Robert Narvaez is the former corporate manager of Environmental Health and Safety (EHS) for Defendant-Employer. He holds an undergraduate degree in environmental management, with emphasis on industrial hygiene, from the University of Houston. He obtained an industrial hygiene certification from the American Board of Industrial Hygienists and was a registered professional industrial hygienist.
57. Mr. Narvaez worked from 1999 or 2000 until February 2005 as the corporate manager of EHS for Defendant-Employer. He was responsible for "managing all aspects of EHS. He also was responsible for managing the medical program, managing worker's compensation cases, and ascertaining health risks to employees. *Page 20 
58. Mr. Narvaez testified that there are aluminum fines created during the manufacture of the cable, and that those fines contained arsenic. The record evidence does not support his testimony that the fines contained arsenic. Dr. Gad, Ph.D., the toxicologist retained by Defendants, testified that he reviewed MSDS sheets in regard to the aluminum. He also reviewed the certifications of aluminum from the supplier for the Statesville Facility of CommScope. In regard to whether the MSDS for aluminum indicated that arsenic was a trace element, he said that the MSDS sheets for the aluminum addressed known carcinogens, arsenic being a carcinogen, and it indicated that no carcinogens were noted in the MSDS sheet for the aluminum. The MSDS sheet for the aluminum does not indicate that arsenic is present. A review of the MSDS sheet for Wrogth Aluminum products, the supplier, shows that it does not mention arsenic. Furthermore, Dr. Gad stated that the certifications from the supplier of aluminum for the Statesville Facility indicated that arsenic was not contained in their aluminum.
59. A review of the approximately 478 pages of aluminum certifications from the supplier produced from the Statesville facility shows that arsenic is not listed as a trace element. These certifications clearly show that arsenic was not contained in the aluminum. Scott Waddell testified that the aluminum fine wire that is used at the Catawba facility came from the Statesville plant. It was brought in on spools and placed in the vats when it was ready to be processed.
60. Randy Minton, who was offered as an expert in Material Engineering, testified that none of the products used at the Catawba facility have arsenic. The Full Commission assigns more weight to the testimony of Dr. Gad and Randy Minton than to the testimony of Robert Narvaez. Robert Narvaez had been terminated by the Employer prior to his testimony. Moreover, as a Materials Engineer, Randy Minton is more qualified to testify about the materials *Page 21 
used at the Catawba facility. Dr. Gad also testified that based upon his review of the MSDS sheets, none of the products at the CommScope facility contained arsenic.
61. Based upon the MSDS sheet for aluminum, the aluminum certifications produced by the aluminum supplier, the testimony of Mr. Randy Minton, and the testimony of Dr. Shayne Gad, the Industrial Commission finds that the aluminum fines at the CommScope facility did not contain arsenic. The documentary evidence supports the testimony of Mr. Randy Minton and Dr. Shayne Gad rather than the testimony of Mr. Robert Narvaez.
62. The employees in the trunk department were not exposed to arsenic from the sludge in the vats in the bobbin winding department. Dr. Gad indicated that although the November 2002 samples from the sludge showed 36 milligrams per kilogram in the sludge, that level is "Very low, very much below occupational exposure guidelines". The test results from the oil in the vat showed below detectable limits for arsenic. There is no evidence of record to determine the source of the arsenic found in the sludge. As indicated by Dr. Gad, inorganic arsenic is not very soluble. You cannot get arsenic to dissolve into oil. It settled into the bottom of the vats in bobbin winding because it was not going to dissolve. The Areochem, Inc documents regarding the testing of the Bobbin Winding Department vats in November of 2002 support Dr. Gad's testimony by showing that the arsenic in the sludge did not dissolve into the oil. If the arsenic did not dissolve in the oil, it could not be in any oil that aerosolized from the vats. Therefore, no weight is given to the testimony by Robert Narvaez regarding droplets of oil containing arsenic.
63. Dr. Gad testified that Mr. Ille, a certified industrial hygienist, performed samplings and readings on a total of 15 operators that were around the Bobbin Winding vats where they had the oil. Mr. Ille's report shows that his collection date was December 10, 2002. The test was *Page 22 
performed prior to the sludge being removed on December 29, 2002 and January 5, 2003, as indicated by the waste log. Arsenic was one of the heavy metals that was being tested for. Dr. Gad stated that he was familiar with the testing methods. Mr. Ille was using personal samplers which were placed on the workers while they are actually performing their jobs. As the report indicates, the employees tested were actually in the Bobbin Winding department where the vats were located. Thus, they were close to the vats, whereas Plaintiff was 520 feet away from the vats. As Robert Narvaez admitted during cross examination, the test report indicated that the arsenic level was below the limit of detection.
64. A wipe test would not have been a more accurate test of the arsenic at the Catawba Facility. As Dr. Gad indicated, inorganic arsenic is absorbed overwhelmingly by inhalation and to a lesser extent by ingestion. Therefore, the air in the region of the breathing zone is the most appropriate way of testing the individuals during the operation to determine occupational exposure. A wipe test actually would measure how much arsenic had fallen or precipitated onto a surface that could be sampled. Wipe tests do not measure the air. It might be applicable to dermal exposure.
65. In addition, there are documents that report a second test of the sludge and oil in the bobbin winding vats in October of 2003. Scott Waddell testified that the test results did not show arsenic in the oil or sludge at that time. This test supports a finding that once the sludge was removed in December of 2002/January of 2003 from the vats, there was no more arsenic present at the plant.
66. A test report for the Line 604 cooling trough water showed that there were 0.27 milligrams per liter found in the water on August 1, 2003. That result was below the drinking *Page 23 
water standard at that time. That result was within the permissible limit of consumption at the time, as Robert Narvaez acknowledged.
67. Dr. Gad in his second deposition testified that based upon his review of the documents there was not an exposure to arsenic or other toxins by Plaintiff at the CommScope facility that could have caused a superimposed neuropathy or caused an insult to a diabetic neuropathy.
68. There is insufficient evidence of record to show that the Plaintiff had sufficient exposure to arsenic or another possible neurotoxin in his employment to cause arsenic poisoning, an arsenic neuropathy, or another toxin-related neuropathy. Dr. Hill indicated that he is not familiar with any studies or literature in regard to the required exposure to arsenic on a chronic basis that would be necessary before one can develop an arsenic type of neuropathy. Despite Defendants providing MSDS sheets for the compounds used at the Catawba Facility, none of Plaintiff's medical experts identified a specific possible neurotoxin, other than arsenic, that can cause a neuropathy.
69. Plaintiff failed to meet his burden of proving that his employment exposed him to toxicologically significant levels of arsenic, or toxicologically significant levels of another toxin or toxins, significant enough to cause arsenic poisoning or other adverse physical effects, including a peripheral neuropathy.
70. The greater weight of the evidence fails to establish that Plaintiff was exposed to arsenic or another potential neurotoxin in his employment that could cause the development of a peripheral neuropathy or arsenic poisoning. *Page 24 
71. The greater weight of the evidence fails to support that any exposure to arsenic or other neurotoxin in his employment was causally related to the development of peripheral neuropathy or any other alleged arsenic poisoning.
72. The greater weight of the evidence fails to support that any exposure to arsenic or other neurotoxins was causally related to the development of a superimposed toxic or arsenic neuropathy, or an insult to a diabetic neuropathy.
73. The Plaintiff has failed to prove that he sustained the onset of a compensable occupational disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. It may accept or reject the testimony of a witness, in whole or part, depending solely upon whether it believes or disbelieves the same.See N.C. Gen. Stat. § 97-84; Smith v. William MuirheadConstr. Co., 27 N.C. App. 286, 291, 218 S.E.2d 717, 720 (1975).
2. Plaintiff has not established by the greater weight of the evidence that he sustained a compensable occupational disease or other injury as a result of his work with Defendant-Employer. N.C. Gen. Stat. § 97-53. For an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), it must be (1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [plaintiff's] employment." *Page 25 Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85, 93;301 S.E.2d 359, 365 (1983) [quoting Hansel v. ShermanTextiles, 304 N.C. 44, 52, 283 S.E.2d 101, 105-06 (1981) citingBooker v. Duke Med. Ctr., 297 N.C. 458,468,475; 256 S.E.2d 189,196,200 (1979)].
3. In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc.,136 N.C. App. 351, 524 S.E.2d 368 (2000) [citing Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983)]. Further, a Plaintiff seeking to prove that he has a compensable occupational disease must show that the employment exposed him to an increased risk of contracting, not merely aggravating, the condition.Chambers v. Transit Mgmt., 360 N.C. 609, 636 S.E.2d 553 (2006).
4. In this case, the greater weight of the medical evidence of record, when considered in its entirety, is insufficient to establish the necessary causal relationship for Plaintiff's condition to be compensable as an occupational disease and specifically to prove Plaintiff's employment exposed him to a greater risk of contracting peripheral neuropathy relative to the general public. N.C. Gen. Stat. § 97-53(13); Booker v. MedicalCenter, supra.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and is hereby, DENIED.
2. Each side shall bear its own costs.
This the 2nd day of November, 2010. *Page 26 
 S/_____________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER